IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**PATRICIA BICKFORD**,                                      Civil Case No. 09-833-KI

                Plaintiff,

    vs.                                                                   OPINION AND ORDER

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                Defendant.


       Tim Wilborn
       Wilborn Law Office, P.C.
       P. O. Box 2768
       Oregon City, Oregon  97045

            Attorney for Plaintiff

       Dwight C. Holton
       United States Attorney
       District of Oregon

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2904

Richard A. Morris
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

      Attorneys for Defendant

KING, Judge:

Patricia Bickford brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying her application for disability insurance benefits ("DIB"). I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

Bickford filed an application for DIB on May 8, 2006. The application was denied initially and upon reconsideration. After a timely request for a hearing, Bickford, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on November 4, 2008.

On December 18, 2008, the ALJ issued a decision finding Bickford not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on June 5, 2009.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of DIB to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in substantial gainful activity. If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which

significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ concluded that Bickford was insured through December 31, 2010 and that her bipolar disorder was severe.  The ALJ also found that this impairment was not severe enough to meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  In performing that analysis, with respect to the "paragraph B" criteria in Listing 12.04, the ALJ did note that Bickford had moderate difficulties with concentration, persistence or pace based on her report that she had difficulties concentrating.  The ALJ then indicated that the listing determination was "not a residual functional capacity assessment."  Tr. 78.  The ALJ further opined that Bickford retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with nonexertional limitations and that Bickford could perform simple, repetitive tasks.  As a result, the ALJ opined that the RFC he formulated for Bickford "reflects the degree of limitation I have found in the 'paragraph B' mental function analysis."  Tr. 79.  The ALJ concluded that Bickford could not perform her past relevant work, but, after consulting the Medical-Vocational Rules, he determined that a significant occupational unskilled base existed.  As a result, Bickford was not disabled from May 25, 2005 through the date of the decision.

Bickford, who was 57 years old at the time of her onset date of disability, has a high school degree. Her medical records reflect that she has suffered from bipolar disorder since the 1980s.

Bickford lived and worked in California for years. She initially sought medical help in 1982 after the police were called due to her manic behavior. She received DIB from 1994 through 2001 for PTSD. The agency terminated her DIB when it learned she had returned to work, and demanded she return the $32,000 to $35,000 in benefits she had received.[1] Bickford left her job and moved to Oregon to live near her son and grandchildren in 2005. At that time, her treating physician in California, Douglas P. Murphy, M.D., reported that Bickford had "been receiving treatment for Bipolar Mood Disorder, which has been quite stable on a combination of Lithium and Risperdal." Tr. 270. Dr. Murphy also indicated that Bickford would need "ongoing care for this illness and continuation" of her medications. Id.

After arriving in Oregon, Bickford established care in July 2005 with Nancy Brennan, D.O. Bickford reported feeling fine and reported no symptoms. She also informed Dr. Brennan that she took Lithium and Risperdal to treat her bipolar disorder and that "she has been controlled as long as she took her medication." Tr. 306. She worked at Macy's until December 2005 when she left to care for her grandchildren.

On May 26, 2006, Bickford completed the agency's fatigue questionnaire, reporting that she had trouble getting out of bed due to a lack of motivation. After getting out of bed, she got

---

[1]One figure in the record is $35,000. See Tr. 282. The ALJ, in the hearing, said it was a $32,000 overpayment, which Bickford did not dispute. Tr. 24.

dressed, brushed her teeth, took her medications, ate breakfast, and went to her son's house where she cared for her preschool-age grandchild and, later in the day, three school-age grandchildren. When she returned home, she cooked a simple dinner, watched television or paid bills, took her medications, brushed her teeth and went to sleep.

On August 9, 2006, Bickford sought treatment for her bipolar disorder at Lifeworks. She reported feeling "mellow," was getting eight to nine hours of sleep, but feeling tired in the morning. Tr. 312. On a mood assessment checklist, the only items she marked as extreme were that she had a low energy level, an increase or decrease in appetite, and that she spent most of her time alone. It took her a "significant amount of time filling out paperwork" and her appointment was rescheduled. Tr. 312.

On August 30, 2006, Michelle Whitehead, M.H.N.P., Ph.D., evaluated Bickford and, as part of that evaluation, reviewed Dr. Murphy's letter, a third-party function report, Dr. Brennan's medical records, Bickford's fatigue questionnaire, and a work history report. At the time of the evaluation, Bickford reported working for a telemarketing company for 16 hours a week. The evaluation revealed Bickford had "goal directed mental activity with average rate of speech," was "pleasant, subdued and even in her mood," and displayed average "[i]ntellectual and cognitive abilities." Tr. 319. She lived by herself, performed household chores and shopped without help, attended church with friends, ate lunch with these friends, used the computer, and recently started an online dating account. She babysat her grandchildren irregularly. Dr. Whitehead opined that Bickford's condition was controlled, but that it was unlikely Bickford could work full time. She

could work 16 to 20 hours a week.  Dr. Whitehead placed Bickford at 58-62 on the Global

Assessment of Functioning ("GAF") scale.[2]

State agency consultant, Dorothy Anderson, Ph.D., opined that Bickford's impairments

were not severe in September 2006.  Dr. Anderson identified mild limitations in maintaining

social functioning and maintaining concentration, persistence or pace.  She opined that the record

indicated Bickford was capable of managing a social life, running her home, and retaining a part-

time job without significant problems.

In December of 2006, Bickford began seeing Anthony J. Monteverdi, M.D., who, in his

initial psychiatric assessment of her, reported Bickford's last manic state was in 2003.  She had

never had any inpatient admissions or emergency room visits because of mania or depression.

She reported she had been exploring online dating and "states that she actually has intent to meet

a man from Oklahoma in Portland in a few weeks time in hopes of a romantic connection."  Tr.

387.  Her longest job was 14 years working for the State of California in the accounting

department at a prison.  Her mood was stable at the time of the evaluation.  Dr. Monteverdi

assigned a GAF of 65.

At later appointments, she expressed an interest in moving away from synthetic

medications in favor of natural remedies.  Dr. Monteverdi supported her in that request,

---

[2]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to
determine the individual's overall functioning. A GAF of 51 to 60 means "**Moderate symptoms**
(e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in
social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-
workers)."  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental
Disorders 34 (4th ed. 2000) ("DSM-IV").  A GAF of 61 to 70 means "**Some mild symptoms**
(e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or
school functioning** (e.g., occasional truancy, or theft within the household), **but generally
functioning pretty well, has some meaningful interpersonal relationships**."  Id.

suggesting she halve her dosage of Risperdal, but watch closely for rising paranoia. In February 2007, she reported emotional volatility due to losing a friend by saying something hurtful. Otherwise, she was "reasonably stable right now." Tr. 382. She was successful in moving off the Risperdal. She informed Dr. Monteverdi in June 2007 that she was applying for disability. He then reported:

> I think historically what Patricia has shared with me has been indicative of something which is likely to be a cyclical process and continue to cause elements of disruption in whatever she would try to do in employment. That being said, she has been relatively stable since I have seen her. She has a history of having much less stability than this, and it may be best to go after the records surrounding some of those more severely unstable times.

Tr. 380.

Again in August, Bickford spoke with Dr. Monteverdi about her disability application. He read the June note to her and said, "I feel the likelihood of her being destabilized by a work situation is high. That being said, in reference to what specifically has happened I have not laid witness to that instability and I think that there needs to be a reference made to Dr. Murphy's records for the details of those incidences." Tr. 379.

Again, in September, she reported doing well, although she experienced some elevated mood after a change in her Lithium dosage. In October, she reported feeling okay.

She began seeing Jeffrey Gray, Ph.D., for talk therapy in October. She reported having a recent manic episode which she believed was precipitated by medication changes. Her thoughts were mildly tangential. Later that month, Dr. Gray continued to comment on Bickford's tangential thought processes and her difficulty in answering questions, but reported that she answered questions when he repeated them. Dr. Gray remarked that Bickford "spoke of chance

encounters and involving herself with strangers; this is inconsistent with [her] claim that she has paranoid ideation." Tr. 392. He noted she was successful in her work as a telephone solicitor, that she enjoyed the conversation, but that the work made her anxious. He also stated, "She appears anxious to be seen as psychologically disabled due to disability claims." Id. She testified at the hearing that she was laid off from the telephone solicitation job.

In December, she told Dr. Monteverdi she was experiencing some visual hallucinations and breakthrough intrusive thoughts and she started taking Risperdal again. She asked about working as a nanny, and Dr. Monteverdi encouraged her to consider working with other childcare providers in case she should have a psychotic episode.

In January of 2008, Bickford brought in a checklist from her attorney for Dr. Monteverdi to fill out. His chart notes reflect his thoughts as follows:

> Generally it wants me to talk about whether she is markedly or moderately limited in certain ways. My idea is that markedly limited means that she would not be able to remember how to tie her shoes with regards to memory, so most of the measures are given moderately. I do think she is markedly comprised [sic] in her ability to maintain a regular schedule with complex tasks without significant supervision, so I am able to say that on the paperwork. I also state that she has been pretty consistently the same since I began seeing her in December 2006, with her bipolar variations.

Tr. 374.

The next day, Dr. Monteverdi's chart note indicates that Bickford had called the on-call doctor the previous night, complaining of anxiety and reporting that "this is the primary sort of symptomatology [sic] that makes her feel as though she is disabled and unable to work chronically." Tr. 373. She asked the on-call doctor to inform Dr. Monteverdi so he would note it in her chart. Dr. Monteverdi then recorded the following thoughts:

To reiterate, we spent quite a bit of time filling out paperwork yesterday and going through it question by question with Patricia. I was as honest and forthright as I could possibly be on that evaluation and that paperwork. Should she feel as though it was not a legitimate representation, I will suggest to Patricia that she seek a second opinion.

Id.

On the checklist, Dr. Monteverdi identified Bickford as markedly limited in the following areas: (1) the ability to maintain attention and concentration for extended periods; and (2) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He opined that she was otherwise mildly or moderately limited in the general categories of understanding and memory, sustained concentration and persistence, social interaction and adaptation. "Moderately" is defined to mean an impairment which "seriously interferes with the individual's ability to perform the designated activity on a regular and sustained basis," while "markedly" is defined to mean an impairment which "precludes the individual's ability to function independently[.]" Tr. 367.

The next day, Bickford met with Dr. Monteverdi and reported that she was terminated from her job for having a panic attack. Dr. Monteverdi encouraged her to get a statement from her employer. She had worked for only four days at the Day's Inn as a desk clerk.

Dr. Monteverdi saw both Bickford and her son at a session in February. Bickford's son was "questioning the legitimacy of her diagnosis. He feels as though there are significant personality problems and she frequently uses the bipolar disorder as a bail out. I talk to him about my own reservations but the fact that I did see his mom significantly destabilized just a few months ago with some high stress at work and some other family stressors." Tr. 371.

Beginning in February, Bickford began seeing John Prignano, Ph.D., for therapy. His notes reflect that they discussed Bickford's childhood and past work experiences. She stopped seeing him in April because of the co-payment obligation. Dr. Prignano's last note from April reflected that Bickford was doing well on her medications and working for a storage business where she was happy. She worked at the storage business twelve hours a week.

Bickford did not see Dr. Monteverdi again until October 2008. She had contacted him the day before and Dr. Monteverdi was able to squeeze her in after another patient cancelled. She brought in a list of behaviors that were of concern to her. She reported that she was proceeding with her disability application and requested that any notes from the day be sent to her attorney "to help substantiate her case which will be dealt with next week." Tr. 425. She reported feeling manic in September, but Dr. Monteverdi thought she had settled down. He recommended regular psychotherapy.

## DISCUSSION

I.    Credibility

Bickford contends the ALJ's credibility analysis is flawed. She testified to having memory problems, and having difficulty completing tasks, concentrating and following instructions. She also testified to feeling paranoid and victimized. She believed her bipolar disorder kept her from performing full-time work.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The

claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. Id. The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The evidence supports a conclusion that Bickford's impairments could cause some degree of limitation and there is no evidence of malingering. As a result, the ALJ's reasons for finding Bickford not as limited as she testified must be clear and convincing.

Although Bickford testified to problems with concentrating, the ALJ pointed out that Dr. Whitehead's testing revealed Bickford could spell "world" forward and backward and she could recall three out of three items. Nevertheless, the ALJ credited her testimony and found her moderately limited in concentration.

The ALJ did find, however, that Bickford's activities, such as her ability to prepare her own meals, take care of her house, drive a car, shop, go to church, and start online dating, was evidence that she was not as limited as she reported. The ALJ was particularly persuaded by the fact that Bickford worked after her alleged onset date of disability, including babysitting her

grandchildren. He also pointed to her testimony that she was able to work full time sometimes, and that she had done so in the past to support herself.

Bickford disputes that her activities undermine her testimony. It is true shopping and attending church one hour a week do not support a finding that she can perform full-time work, but those activities do undermine her testimony that her paranoia and fear are incapacitating. Bickford contends there is no evidence she used the online dating account, but she is wrong. She told Dr. Monteverdi that she was planning on meeting someone from Oklahoma. Additionally, Bickford argues her symptoms are cyclical, which means she could work for a period of time and then be unable to do so. The evidence, however, is that she left her job in California to be closer to her children and grandchildren, she left her job at Macy's to care for her grandchildren, she was laid off from her job as a telephone solicitor, and she worked as a babysitter in between those jobs. The only job she left because of anxiety during the relevant period was the desk clerk position at Day's Inn. The ALJ properly took into account the fact that Bickford was able to work "with a fair amount of success" during the time she alleged she was disabled. Drouin v. Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992). It is true that although Bickford babysat, Dr. Monteverdi recommended she not be alone with children because she might have a psychotic episode. The ALJ, however, properly gave no weight to Dr. Monteverdi's opinion, as I discuss below.

The ALJ also discussed the fact that Bickford's full time work overlapped with her prior receipt of benefits, resulting in an overpayment of $32,000 that the agency attempted to collect from her. He then stated that Bickford discharged this overpayment in bankruptcy and avoided having to repay it; the ALJ saw this as evidence of manipulative and dishonest behavior.

Bickford takes issue with the ALJ's conclusion that her benefits overpayment and bankruptcy were her fault. I agree with Bickford that, although she testified she filed for bankruptcy, there is no evidence in the record she discharged her disability overpayment. However, there is ample evidence in the record that she worked full time while receiving disability benefits and obtained $32,000 to $35,000 more than she was entitled to. Tr. 23 (testified to "big overpayment"); Tr. 282 (report to Dr. Murphy that SS wanted her to pay back $35,000 in overpayment). Furthermore, the SSA must waive repayment of benefit overpayments if the claimant was <u>without fault</u> in causing the overpayment. 42 U.S.C. § 404(b) (emphasis added). Fault may arise from: (a) an incorrect statement that the claimant "knew or should have known to be incorrect," (b) from failure to provide information that the claimant "knew or should have known to be material," or (c) from acceptance of a payment that the claimant "either knew or could have been expected to know was incorrect." 20 C.F.R. § 404.507. As a result, the fact that the agency did not waive the overpayment is evidence that it was the result of Bickford's wrongdoing. In short, Bickford returned to work full-time *while receiving* disability benefits and did not alert the agency of her change in condition; this is a clear and convincing reason to find Bickford less than truthful. <u>See</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ can use "ordinary techniques of credibility evaluation," which includes reputation for lying or other less than candid statements). The fact that the ALJ relied on Bickford's bankruptcy, the effect of which was not part of the record, does not undermine the ALJ's entire credibility assessment. <u>Batson</u>, 359 F.3d at 1197.

The ALJ also pointed to the medical evidence, such as Dr. Murphy's letter that Bickford had been "quite stable" and Dr. Monteverdi's report that Bickford had been "pretty consistently

the same." Tr. 81.  Although the ALJ cannot reject subjective testimony solely because it was

not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in

determining the severity of the pain and its disabling effects.  Rollins v. Massanari, 261 F.3d 853,

857 (9th Cir. 2001).  Here, Bickford's doctors reported her condition was stable.  She was able to

work full-time in California, and only left her job because she wanted to move to Oregon to live

near her son and grandchildren.

Finally, the ALJ viewed Bickford's interactions with Dr. Monteverdi, surrounding her

request that the doctor complete a checklist regarding the severity of her bipolar disorder, as

evidence of Bickford's "manipulative quest for disability benefits."  Tr. 81.  Similarly, he noted

Bickford's son's comments to Dr. Monteverdi that his mother used the bipolar diagnosis as a

"bail out."  Tr. 82.  The ALJ viewed this comment as "an accurate observation by someone who

knows the claimant quite well."  Id.  This was a rational interpretation of the evidence.[3]

The ALJ's credibility finding is supported by substantial evidence in the record.

II.      Lay Testimony

Bickford challenges the ALJ's treatment of the statements made by her life skills

counselor, Christy Svendsen, and her three friends, Becky Drummond, Barbara McDonald and

Lucinda Culpepper.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must

take into account unless he gives reasons for the rejection that are germane to each witness.

Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).  A medical diagnosis,

_____

[3]I note also Dr. Gray's report that Bickford seemed anxious to be perceived as
psychologically disabled to support her disability claim.

however, is beyond the competence of lay witnesses.  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).

Drummond, a friend of Bickford's for sixteen years, submitted a written statement noting that Bickford had worked for her and she was "not happy with the outcome–[Bickford] is slow and has her interpretation of doing things and therefore [I] had to redo stuff I paid her to do."  Tr. 161.  Drummond believed that Bickford had trouble following verbal orders.  Bickford shopped, but tried to avoid crowds and made poor spending decisions.  She attended plays, but she left in the middle of the performances at times because of the crowds.  Drummond also thought Bickford got along well with authority figures and that her medication helped her handle stress. She cooked for herself, lived alone and needed no help with personal care, performed household chores and yard work, drove a car, went outside daily, babysat her grandchildren, and went to church on a regular basis.

The ALJ "considered this reporting but note[d] that the claimant is able to engage in a wide range of activities."  Tr. 80.

Barbara McDonald, a friend of two years, submitted a written statement observing that Bickford had memory problems, laughed inappropriately at times, made poor financial decisions, and could not work a full-time job because of stress.  Lucinda Culpepper submitted a statement on behalf of Bickford.  Culpepper wrote Bickford had memory problems, which made it hard for co-workers to work with her, and she spent time alone.

Finally, Svendsen testified that she worked for Central Oregon Resources for Independent Living, a non-profit organization of disabled people helping other disabled people with life skills. She informed the ALJ that Bickford helped her facilitate a weekly group meeting.  Bickford

brought in training and reading materials, guided people through the materials, and led the group by herself when Svedsen was sick. Svedsen described Bickford's panic attack while working as a night auditor at a local inn, she informed the ALJ about Bickford's tendency to get taken advantage of, and her impulsive behavior. She opined that Bickford needed written instructions and routine tasks.

The ALJ considered all of these statements, but repeated that Bickford was able to keep a part-time job and engage in a wide range of activities. As a result, he believed she could work full-time.

Bickford reiterates her complaint that her activities does not support a finding that she can withstand the stress and structure of work activity regularly. The ALJ's analysis of how Bickford's activities undermined her credibility is equally applicable here. Her social activities undermine her assertions of paranoia and fear. Her work after her alleged onset date of disability which, with the exception of one job, she left voluntarily or from which she was laid off, is evidence that she can perform full-time work. These are germane reasons for finding the lay witness reports unpersuasive. See Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (rejected lay witness testimony because the ALJ found claimant's testimony about his activities undermined his credibility).

The ALJ did not err in evaluating the lay testimony.

III.    Medical Evidence

Bickford challenges the ALJ's decision to give no weight to Dr. Monteverdi's January 2008 functional assessment and little weight to Dr. Whitehead's opinion that Bickford could only work part-time.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Widmark, 454 F.3d at 1066 n.2. Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by and are consistent with other evidence in the record. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

A.      Dr. Monteverdi

The ALJ gave no weight to Dr. Monteverdi's checklist indicating that Bickford had moderate and marked limitations. The ALJ pointed out that Dr. Monteverdi's records reflect his opinion that Bickford had been "pretty consistently the same" since he began treating her. The ALJ believed from the records that Bickford "encourage[d]" Dr. Monteverdi to find that she was moderately or markedly limited. In addition, the checklist was not consistent with the other medical evidence, Dr. Monteverdi's treatment notes, or Bickford's daily activities.

Since Dr. Monteverdi's functional analysis conflicted with State agency consulting physician Dr. Anderson's similar analysis, the ALJ needed to provide specific and legitimate reasons supported by substantial evidence in the record to support his rejection of Dr. Monteverdi's opinion. He did so. The evidence reflects that Bickford was stable on her medications and nothing in Dr. Monteverdi's treatment notes reflected the limitations he found in his January 2008 assessment of her. An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings." Batson, 359 F.3d at 1195. Furthermore, the ALJ's view of Bickford's actions as manipulative is a rational conclusion based on substantial evidence in the record. Her history is that she worked while receiving disability benefits and owed a large overpayment, her son felt that she inappropriately relied on her diagnosis to avoid obligations, and her pattern of visits with Dr. Monteverdi was odd. Dr. Monteverdi repeatedly noted that he had not seen Bickford's instability, she asked that he document her failed work attempt at Day's Inn the day after it occurred, and then asked that he see her at the last minute a week before her disability hearing. The ALJ's conclusion that Bickford was manipulative in her attempt to obtain disability benefits is a rational view of the evidence. The ALJ did not err in rejecting Dr. Monteverdi's opinion.

B.      Dr. Whitehead

The ALJ gave little weight to Dr. Whitehead's opinion that Bickford could perform only part-time work. The ALJ concluded Dr. Whitehead's opinion was not consistent with the objective medical evidence, was based on Bickford's report to her that she could not work full-time, and Dr. Whitehead did not know Bickford's full work history.

Again, the ALJ proffered specific and legitimate reasons for giving Dr. Whitehead's opinion less weight than Dr. Anderson's opinion. According to Dr. Whitehead, Bickford had a moderate to mild GAF score and her symptoms were stabilized by medication. As a result, her conclusion that Bickford was limited to part-time work was not supported by any objective medical findings. Batson, 359 F.3d at 1195. Dr. Whitehead nowhere explains why she believed Bickford could not work full-time.

Bickford asserts Dr. Whitehead knew her work history and the Commissioner concedes the work report was not inaccurate. As a result, this is not a reason to reject Dr. Whitehead's opinion. Nevertheless, the ALJ's decision is sufficiently supported by the other reasons he gave.

IV.     Residual Functional Capacity

Bickford complains that: (1) the ALJ never assessed her mental RFC; (2) the ALJ's determination that she could perform unskilled work did not capture her moderate difficulties in maintaining concentration, persistence or pace; and (3) the RFC does not reflect her severe mental impairment.

To assess these arguments, I have carefully examined the ALJ's decision. In evaluating whether Bickford's mental impairments met or equaled Listing 12.04, the ALJ concluded, "With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant has reported difficulties with concentration." Tr. 78. Nevertheless, the ALJ noted Bickford could spell "world" forward and backward and could recall three out of three items. The ALJ later explained, in crafting Bickford's RFC, that he gave Bickford's "report of difficulties with concentration some weight and limited her to simple, repetitive tasks." Tr. 82. The listing determination was "not a residual functional capacity assessment" and the RFC "reflects the

degree of limitation I have found in the 'paragraph B' mental function analysis." Tr. 78, 79. The ALJ then concluded that "these limitations have little or no effect on the occupational base of unskilled work at all exertional levels," and he found her not disabled under the Medical Vocational Guidelines. Tr. 83.

It is apparent, then, that the ALJ did in fact assess Bickford's mental RFC. Despite problems with concentration, according to the ALJ, Bickford could perform simple, repetitive tasks. As for the second issue–that the RFC does not reflect the ALJ's own conclusion about Bickford's moderate difficulty with concentration, persistence or pace–a close reading of the ALJ's opinion reveals that he found Bickford suffered moderate difficulties only in concentration. The "paragraph B" criteria in Listing 12.04 are in the disjunctive. The ALJ's conclusion is obviously limited to Bickford's problem with concentration, and is not a finding that Bickford suffered from limitations in concentration, persistence *and* pace.

As a result, the question is whether someone who suffers from moderate difficulties in concentration can perform simple, repetitive tasks. The cases on this issue vary depending on the facts. In short, so long as the ALJ's decision is supported by medical evidence, a limitation to simple, repetitive work can account for moderate difficulties in concentration, persistence or pace. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (RFC of "simple, routine, repetitive" work is consistent with doctor's opinion that claimant can carry out "very short simple instructions," "maintain attention and concentration for extended periods," and "sustain an ordinary routine without special supervision."); Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (limitation of often having deficiencies of concentration, persistence or pace which was interpreted by a doctor into a functional capacity assessment of being "able to sustain

sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function" was adequately captured in a hypothetical for "someone who is capable of doing simple, repetitive, routine tasks").

Here, in contrast, the ALJ relied on the State agency medical consultant to find Bickford could perform simple, repetitive tasks. The State agency consultant, however, concluded Bickford's mental impairment was not severe to begin with, and who opined that Bickford had only mild difficulties in concentration, persistence or pace. Accordingly, there is no evidentiary basis for the ALJ to conclude an RFC limiting Bickford to simple tasks adequately accounts for her moderate difficulties in concentrating. See Brink v. Comm'r Social Sec. Admin., 343 Fed. Appx. 211, 212 (9th Cir. 2009) (simple, repetitive work does not capture limitations on concentration, persistence or pace). As a result, this case must be remanded for testimony from a vocational expert ("VE") who can inform the ALJ about whether Bickford can perform unskilled work, or any other work, if she has moderate difficulties in concentration.

Since I remand for testimony from a VE, I need not determine whether the ALJ improperly concluded that someone with Bickford's RFC could perform unskilled work when such a finding "describes the complexity of the tasks a worker can handle; it does not address the 'pace' at which the individual can work, the 'concentration' required to perform the tasks, or the persistence required to perform the tasks." Pl's. Opening Br. at 12. I leave this issue for the ALJ to resolve, with the assistance of a VE.

Finally, I note the following for the record: finding Bickford capable of performing unskilled work is not inconsistent with a conclusion that Bickford's bipolar disorder is a "severe" impairment. It is true that in order to qualify as a "severe" impairment, the impairment must

significantly limit her ability to perform a basic work activity. 20 C.F.R. § 404.1521. However, Bickford's argument has been rejected by the Ninth Circuit. Bray v. Comm'r of Soc. Sec., 554 F.3d 1219, 1228-29 (9th Cir. 2009) ("Bray offers no authority to support the proposition that a severe mental impairment must correspond to limitations on a claimant's ability to perform basic work activities."); see also Gunderson v. Astrue, 371 Fed. Appx. 807, 809 (9th Cir. Mar. 22, 2010) (step two is "de minimis screening device to dispose of groundless claims" and "step two and step five determinations require different levels of severity of limitations").

For the reasons stated above, the ALJ erred in concluding Bickford could perform work which involved simple, repetitive tasks when he also found she had moderate difficulties in concentration, in the absence of medical or other evidentiary support for his conclusion in the record.

V.      The Medical Vocational Guidelines

Bickford argues that the ALJ improperly relied on the Medical Vocational Guidelines to come to the conclusion that there were sufficient jobs in the national economy she could perform. Bickford contends that because she has nonexertional limitations, the ALJ erred in employing the Guidelines to find her not disabled. Since I remand for testimony from a VE, I need not address whether the ALJ improperly resorted to the Guidelines to find Bickford not disabled.

VI.     Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits. McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has the flexibility to remand to allow the ALJ to make further determinations, including reconsidering the credibility of the claimant. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir.

2003).  This is not "the unusual case in which it is clear from the record that the claimant is

unable to perform gainful employment in the national economy[.]"  <u>Benecke v. Barnhart</u>, 379

F.3d 587, 595 (9th Cir. 2004).  Accordingly, I remand for further hearing, including for testimony

from a VE regarding which jobs, if any, Bickford can perform with her moderate difficulties in

concentration.

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

Dated this _____19th_____ day of October, 2010.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge